# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**GEORGE E. WALKER,**

Plaintiff,

v.

**NORTHWEST AIRLINES, INC.,**

Defendant.

---

Civil No. 00-2604 (MJD/JGL)

**REPORT AND RECOMMENDATION**

APPEARANCES

Todd M. Roen, Esq., for Plaintiff George E. Walker

Tracy J. Van Steenburgh, Esq., for Defendant Northwest Airlines, Inc.

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

The above-entitled matter came on for hearing before the undersigned Chief Magistrate Judge of District Court on October 9, 2003, a Motion for Summary Judgment by Defendant Northwest Airlines, Inc. (Doc. No. 96). The case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

## I. INTRODUCTION

This case involves allegations of racial and sexual harassment and reprisal in the workplace. Plaintiff Walker, an African American male, worked from May 1994 until December 1999 as an Equipment Service Employee ("ESE") for Defendant Northwest Airlines, Inc. ("Northwest"). In his Complaint, Walker alleges race discrimination and hostile work environment claims under

FILED ____
RICHARD D. SLETTEN, CLERK
JUDGMENT ENT'D ____
DEPUTY CLERK ____

42 U.S.C. § 1981; race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 29 U.S.C. § 2000e et seq.; and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.

## II. FACTUAL BACKGROUND

For the purpose of summary judgment, the Court views the facts in the light most favorable to the non-moving party. Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997) (citations omitted). However, Plaintiff Walker has made this task most difficult for the Court. As noted by Defendant during oral argument, Walker's statement of the facts in his Memorandum in Opposition to Summary Judgment is replete with factual assertions wholly unsupported by the record to which he cites. For but one example, Walker states in his Memorandum that a co-worker used the racially derogatory word "nigger," and cites to his Deposition for support. (Pl.'s Mem. Opp'n Mot. Summ. J. at 3.) The portion of the Deposition cited has no mention of that particularly distasteful and charged epithet. (See Walker Dep. at 94:21-22.) Further, Walker frequently relies on "Exhibit 7" to his Deposition, which has never been filed with or provided to the Court. Thus, the Court has no way of knowing what exactly Exhibit 7 is supposed to be, let alone verifying that Walker's factual assertions based on that Exhibit are actually supported by the record. Consequently, the Court's recitation of the factual background is based only on undisputed facts or facts for which support could be found in the record rather than upon Plaintiff's view of the facts.

During 1999, Walker was stationed temporarily in Phoenix as a third shift Lead ESE. Under the terms of the collective bargaining agreement ("CBA") between Northwest and the union, ESEs bid for positions throughout the Northwest system, and Lead ESE positions are awarded based on seniority. In Phoenix, Walker joined William Miller, a Caucasian permanent Lead ESE. Walker was the only Black or African American Lead ESE at the Phoenix Station. (Walker Dep. at 155:19-21.) Lead ESE responsibilities include grooming (or cleaning) aircraft, loading and unloading baggage from aircraft, and coordinating the work of other ESEs. (Id. at 84:4 - 85:10.) Walker and Miller were personally responsible for ensuring that all Remaining Overnight ("RON") aircraft were properly groomed. (Id. at 85:8-10, 88:9-17.) During that time, aircraft grooming was a primary corporate and management focus. (Id. at 111:21-112:13.) Walker's manager and supervisor, Richard Vandermolen, repeatedly sent memoranda to various shift Leads, including Miller and Walker, stressing such importance. (Id. at120:18-121:18, Exs. 8-17.) Until 1999, Northwest had not disciplined Walker. (Walker Dep. at 71:18-19.)

In February 1999, Patricia Chrzanowski, a white ESE on Walker's crew, allegedly began threatening Walker and at least once indirectly referred to him by the racially derogatory term "lips" while having a phone conversation with another person. (Id. at 89:18-24, 92:21-22, 93:15-18.) She also discussed sexual matters and her breast implants in Walker's presence at the

workplace. (Id. Ex. 21 at 1.) On one occasion, she put her finger in Walker's face, touched his nose, and cursed at him. (Id. at 93:15-17.)

Walker complained to Vandermolen that Chrzanowski was rude, did not follow directions, and had made inappropriate sexual and racial comments in the workplace. (Id. at 89:12-90:5.) In response, Vandermolen asked Walker to document Chrzanowski's conduct. (Id. at 100:25-102:4, 104:13-105:6.) Vandermolen also spoke to Chrzanowski about her behavior. (Vandermolen Dep. at 63.) At the end of February 1999, Walker began to feel that Vandermolen was increasingly scrutinizing his work. (Walker Dep. at 157:17-158:3.) On March 4, 1999, Walker informed Vandermolen and Phoenix General Manager Bruce Barnhill that he wanted to file an internal Equal Employment Opportunity ("EEO") complaint against Chrzanowski. (Id. at 158:7-12.) Barnhill urged him not to send the matter to Northwest's corporate office in Minneapolis. (Id. at 90:6-17.) Walker did file an internal EEO complaint on March 11, 1999 against both Chrzanowski and Vandermolen, alleging that Chrzanowski had sexually and racially harassed him and that Vandermolen scrutinized his work more closely than the other Lead ESEs and was more critical of his work. (Id. at 104:13-17.)

Northwest's subsequent internal investigation by outside counsel, not issued until December 1999, substantiated Chrzanowski's inappropriate behavior, but found that the comments were not directed at Walker nor made in an attempt to harass him. (Id. Ex. 21 at 1.) Northwest terminated

Chrzanowski for her actions.[1] (Id.) The investigator also found that neither Vandermolen nor Barnhill had violated Northwest's Discrimination and Harassment Policy, finding that Vandermolen took action with regard to Chrzanowski shortly after Walker's complaints. (Id.) However, the investigation substantiated Walker's claim of increased scrutiny, finding that Vandermolen may have scrutinized Walker's work more closely than the work of Miller, but that such scrutiny was reasonable given Walker's newer and temporary status as opposed to Miller's long-term, permanent status. (Id.)

On April 14, 1999, during a grooming audit of a RON aircraft, Barnhill discovered than an inbound flight had not been groomed the previous night during the third shift. (Barnhill Aff. ¶ 6.) Because the aircraft was scheduled to depart, Barnhill pulled other ESEs from their regular duties to perform a quick groom, resulting in both the aircraft returning to service only partially cleaned and the delay of another plane. (Id.) As the only third-shift Lead ESE on duty, Walker was ultimately responsible for the grooming failure, which he has admitted. (Id. at ¶ 7; Walker Dep. at 165:22-167:2.) The problem resulted from Walker's reliance on a co-worker who told him that he had heard that the plane was already cleaned. (Walker Dep. at 163:8-15.) Walker had intended to inspect the plane, but did not because no stairs or power were connected to the plane. (Id. at 165:22-167:2.)

---

[1] She was later reinstated, reportedly after grieving her discipline pursuant to the CBA.



10/28/2003 TUE 21:17 [TX/RX NO 5844]

After Barnhill, Vandermolen, and a union representative met with him that day about the incident, Walker was issued a Level One disciplinary notice.[2] (Id. Ex. 18.; Vandermolen Dep. at 82.) Upset about the discipline, Walker asked to be released early from the temporary Phoenix assignment and Barnhill agreed. (Walker Dep. at 175:21-24.) Barnhill then left and Walker went to clean out his locker. (Id. at 176:3-5.) In the locker area, Walker and Vandermolen began arguing and their exchange escalated into a physical confrontation. (Id. at 176:15-18; Vandermolen Dep. at 93-94.)

When Barnhill learned of the altercation, he requested and received separate written accounts from Walker, Vandermolen, and the union representative also present. (Barnhill Aff. ¶ 11; Walker Dep. at 179:6-10.) Based on those accounts, Barnhill issued a Decision Making Leave ("DML") notice to Walker dated April 26, 1999, in which he cited Walker for violating the Rules of Conduct involving intimidating behavior and inappropriate conduct toward a manager. (Walker Dep. Ex. 19.) Barnhill mailed the DML to Walker's home in Montana and provided a copy to the union. (Walker Tr. at 78:1-8; Barnhill Aff. ¶ 13.) Under the CBA, Walker grieved the DML, which was reduced to a Level Two.

---

[2] A Level One is a written reprimand that remains in the employee's file for nine months and is removed thereafter if the employee receives no further disciple during that time. Additional discipline, if warranted, is issued in the form of a Level Two, or harsher yet, a Decision-Making Leave, which is a one day suspension with pay.

On April 21, 1999, Walker filed a second internal EEO complaint, alleging that Vandermolen and Barnhill had each retaliated against him by issuing the Level 1. (Walker Dep. at 158:14-159:8.) Walker claimed that Vandermolen had retaliated against him for making the initial complaint against Chrzanowski and Vandermolen and that Barnhill had retaliated for his filing a complaint with Northwest's corporate EEO office rather than keeping the matter in Phoenix. (Id.) Barnhill did not receive a copy of the EEO complaint when it was filed and was not aware of it at the time he issued the DML. (Barnhill Dep. at 26-27.) Walker has also admitted that it would have been impossible for Vandermolen and Barnhill to have set him up for discipline with respect to the grooming incident; rather, he asserts that the men were looking for a way or reason to discipline him. (Walker Dep. at 170:15-171:1.)

Northwest retained the same outside counsel who investigated the first EEO complaint. A single letter dated December 11, 1999 announced the counsel's findings regarding both EEO complaints and concluded that the Level One was issued for lack of performance, not in retaliation for Walker's filing of an internal EEO complaint. (Id. Ex. 21 at 1-2.)

Meanwhile, Walker moved to another temporary Lead ESE position in Anchorage, Alaska, on May 17, 1999. Sometime between April 14 and May 17 at a meeting, Walker's Anchorage manager, Christian Samlaska, had a conversation with a Phoenix manager regarding Walker's reputation as problem employee, but he does not remember with whom. (Samlaska Dep. at 16:2-23.)

Samlaska does not recognize the name "Vandermolen." (Id. at 16:21-24; 24:5-19.) Samlaska also stated that someone from Phoenix probably called to inform him of Walker's DML since it was to be served in Anchorage, but that he does not actually remember such a conversation. (Id. at 21:13-25.)

May Sete, a co-worker with whom Walker had an affair, also moved to Anchorage. (Walker Tr. at 15.) In August 1999 when the relationship ended, Walker transferred to a permanent position in San Francisco admittedly to get away from Sete. (Id. at 15-16.) In San Francisco, Walker's personal problems with Sete resulted in a series of harassing pages on his pager. (Id. at 21-22.) Walker and Sete then filed cross-internal EEO complaints, each alleging harassment by the other. (Walker Dep. at 55:17-20.) In response, San Francisco Manager Diane Allard-Smith directed Walker to have no further contact with Sete. (Id. at 55:17-56:3.)

On October 13, 1999, Walker requested and was approved for FMLA leave from October 23, 1999 to January 23, 2000 to care for his wife in Billings, Montana, who was undergoing surgery and chemotherapy. (Id. Ex. 2.) On December 8, 1999, while on leave, Walker traveled to Anchorage to see Sete who was having problems with her pregnancy, returning to Billings on December 9. (Id. at 56:10-24.) He told the gate agent in Billings only that he was traveling for an emergency. (Id. at 42:18-25.) Walker used an expired Northwest business travel pass that he had obtained while working at the Anchorage station. (Id. at 40:21-21, 46:18-23.) Further, Walker did not seek

authorization from his manager to use the pass, as admittedly he knew he was required to do under company policy. (Id. at 47:1-8.) Lastly, Walker violated his manager's directive not to see Sete. (Id. at 55:25-56:7.) Walker believed it was permissible for him to travel using the pass. (Id. at 45:8-25.)

On December 9, 1999, Walker was awarded a permanent post in Las Vegas through Northwest's bidding and seniority system. He contacted Las Vegas Manager Dan Hertzog to discuss returning early from FMLA leave, and Hertzog asked him whether the Level One discipline from Phoenix was still pending. (Id. at 61:4-6, 62:7-14.) When Walker told him it was, Hertzog said he would have to get back to Walker. (Id. at 63:2-10.) Hertzog eventually told him to contact Allard-Smith about returning from leave. (Id. at 62:19-24.)

When Northwest learned of Walker's use of the travel pass, it scheduled a meeting with Walker and a union representative pursuant to the CBA. A meeting scheduled for Billings was cancelled by Walker after a union representative advised him not to attend while on FMLA leave. (Id. at 50:10-51:6.) Walker requested a different union representative and a meeting in Minneapolis, which was scheduled for December 18, 1999. (Id. at 51:7-52:17.) After receiving conflicting advice from union representatives, Walker opted not to attend that meeting either. (Id. at 52:7-53:13.)

Northwest terminated Walker's employment on December 23, 1999 for misrepresenting facts and failing to provide accurate information to the gate agent in Billings in obtaining a trip pass and using pass travel while on leave

without authorization from his manager in violation of the pass travel policy and the company's Rules of Conduct, and for failing to cooperate in an investigation of conduct as required by the Rules of Conduct. (Id. Ex. 3.) Walker asserts that he would not have been terminated for the pass violations if not for the earlier disciplinary actions that were in retaliation for his complaints of discrimination and harassment.

## III. STANDARD OF REVIEW

The Court must view the facts in the light most favorable to Walker. See Lower Brule Sioux Tribe, 104 F.3d at 1021. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed fact is "material" if it must ultimately be resolved and if its resolution will determine the outcome of the case. Id. Materiality is determined by examining the substantive law of the claims. Id.

The non-moving party may not rest upon the pleadings alone as a response but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party may not rely on mere allegations or denials but must present specific facts. Id.; Lambert v. City

of Dumas, 187 F.3d 931, 935 (8th Cir. 1999) (citations omitted). Additionally, the moving party is entitled to summary judgment when the non-moving party fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Finally, the Court recognizes that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases . . . the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995) (citations omitted); Williams v. Thomson Corp., No. 00-CV-2256 (MJD/SRN), 2003 WL 1571559, at *7 (D. Minn. Mar. 21, 2003).

## IV. DISCUSSION

Walker alleges race discrimination under Title VII and § 1981 as well as violation of the FMLA in connection with his employment at Northwest.

### A. Statute of Limitations on Title VII Claims

Walker alleges several claims under Title VII, including race discrimination and retaliation in the form of increased scrutiny in the

workplace and biased discipline while in Phoenix, and race discrimination in the form of termination while in San Francisco.

Northwest argues that Walker's Title VII race discrimination and retaliation claims arising from incidents in Phoenix are time-barred. Title VII provides that a complainant must file a charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days after the alleged unlawful employment practice occurred, or within 300 days after such occurrence if the aggrieved person initially instituted discrimination proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). If a claim is not filed within these time limits, it is time-barred. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). The statute begins running on the date on which the adverse employment action is communicated to the plaintiff. Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1328 (8th Cir. 1995) (citations omitted). Walker urges the Court to apply the 300-day standard and Northwest urges 180 days.

Northwest argues that the 180-day period applies because prior to Walker's response to its Motion for Summary Judgment, Northwest had seen no evidence that Walker had cross-filed with a state agency. While Walker's EEOC form contains a notation at the top for the Arizona Civil Rights Division, a check box on the form designating cross-filing with a state agency is left unmarked. (Walker Dep. Ex. 22.) Further, Northwest represents that it filed a Freedom of Information Act request with the Arizona state agency, which responded that it had no record of a filing by Walker. Lastly, Walker asserted

during discovery that all documents applicable to such filing had been turned over, and none indicated that he had filed with the state agency. (Second Jezierski Aff. Ex. A at 7.) However, in opposing the Motion for Summary Judgment, Walker relied on documentation showing that the EEOC cross-filed his charge with the Arizona state agency under a work-sharing agreement. (Roen Aff. Ex. L.) This information was specifically requested in discovery but not provided to Northwest. (Second Jezierski Aff. Ex. A at 7.)

Federal Rule of Civil Procedure 37(c)(1) provides:

> If a party that without substantial justification fails to disclose information required . . . to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Thus, parties are precluded from relying on withheld documents to create a dispute of material fact unless they can show substantial justification or that the failure was harmless. Fed. F. Civ. P. 37(c)(1). At oral argument, Walker's counsel could provide no reason for the failure to produce the discovery. While admitting that there is no substantial justification for the "oversight," counsel asserts that the failure is harmless since Northwest now has the information.

This Court does not take such dilatory discovery practices lightly. Walker's unjustified withholding of the state agency evidence prejudiced Northwest, especially since discovery is now closed and Northwest's work product and theory of the case have been propounded. Aside from the

withheld documents, the record does not indicate that Walker's charge was cross-filed with the state agency. Thus, the failure to provide discovery caused harm and was admittedly without substantial justification; this Court must disregard the withheld discovery and apply the 180-day standard. See id.

Walker's EEOC charge reflects that he signed it on February 24 and it was filed on March 2, 2000. (Walker Dep. Ex. 22.) Walker asserts that the filing date should be considered February 7. (Compl. ¶ 22.) Walker submitted preliminary information to the EEOC on February 5, 2000. However, the EEOC distinguishes between preliminary submissions and the filing of a charge: "The Commission shall receive information concerning alleged violations of Title VII [and] . . . where the information discloses that a person is entitled to file a charge . . . the appropriate office shall render assistance in the filing of a charge." 29 C.F.R. § 1601.6. Here, the EEOC did render assistance to Walker after his initial correspondence by sending him a "Charge of Discrimination" drafted by the agency, which he was instructed to sign, date, and return to the agency. (Roen Aff. Ex. K.) However, a charge is not deemed to be filed until the agency receives the executed charge, signed and dated by the plaintiff. 29 C.F.R. §§ 1601.9, 1601.13(a)(4)(ii). Thus, March 2, 2000 is the appropriate tolling date. Under the 180-day rule, Walker may only allege adverse actions that occurred on or after September 4, 1999.

Northwest asserts that the last adverse disciplinary action alleged by Walker occurred on April 26, 1999, when Barnhill issued the DML. After

receiving the DML at some point while in Billings, on May 16 Walker grieved the DML under the CBA, which requires employees to grieve any discipline within ten calendar days of written notice. Thus, Northwest argues that Walker received the DML by May 6, 1999. However, as Walker points out, it is possible that he received the DML as late as May 15. Construing the facts in favor of Walker, the Court uses May 15, 1999 as the date Walker received the DML. See Lower Brule Sioux Tribe, 104 F.3d at 1021; Dring, 58 F.3d at 1328.

In his Deposition, Walker stated that all his claims of retaliation and discrimination stem from his time in Phoenix as opposed to Anchorage or San Francisco. (Walker Dep. at 77:15-79:17.) Applying the 180-day statute of limitations, Walker has no possible claims of retaliation or discrimination arising from incidents in Phoenix. Even assuming, arguendo, that a conversation between some Phoenix manager and Samlaska occurred, and that such conversation qualifies as discrimination,[3] Walker asserts it would have occurred at the latest on May 17, 1999. (Pl.'s Mem. Supp. Mot. Summ. J. at 16.) Even construing the facts in Walker's favor, the allegation would be time-barred. Accordingly, summary judgment in favor of Northwest should be

[3] The worst aspect of that event is that the unknown person called Walker a "slug." (Samlaska Dep. at 16:13-17.)

granted on the Title VII race[4] and retaliation claims[5] relating to alleged increased scrutiny and discipline.

**B. Remaining Title VII and § 1981 Claims**

The Court applies the same standards to § 1981 and Title VII claims. Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) (citations omitted). Pursuant to § 1981, Walker alleges race discrimination and hostile work environment while at Northwest's Phoenix station. Walker also asserts that his termination while at the San Francisco station violated § 1981 and Title VII.

**1. Section 1981 Race Discrimination Claims**

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

---

[4] Aside from Walker's procedural deficiencies, his Title VII race discrimination claim would fail on the merits for the same reasons his Title VII termination and § 1981 claims fail, as explained in Section B, infra.

[5] Walker has also failed to establish a prima facie retaliation claim under Title VII, which is governed by the McDonnell Douglas burden-shifting analysis. See E.E.O.C. v. Kohler, Co., 335 F.3d 766, 773 (8th Cir. 2003). To establish a prima facie case of retaliation, Walker must show (1) a complaint of discriminatory treatment, (2) subsequent adverse action by Northwest, and (3) a causal link between the complaint and the adverse action. Smith v. Ashland, Inc., 250 F.3d 1167, 1173 (8th Cir. 2001). Walker has established (1) that he complained about Chrzanowski's behavior, (2) that he later was disciplined, but not (3) that there is any causal link between the two. Walker may not rely on mere allegations, but must present specific facts. Lambert, 187 F.3d at 935. All evidence on the record other than Walker's speculation in his deposition indicates that Walker was disciplined for failing to perform his job duties.

42 U.S.C. § 1981(b). Where a plaintiff relies on circumstantial evidence of discrimination, courts apply the burden-shifting analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973); Williams, 2003 WL 1571559, at *10. The plaintiff bears the initial burden of proving a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. The defendant's burden is then to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. Finally, the plaintiff must show that the defendant's proffered reason is pretextual. Id. at 804.

The plaintiff accomplishes this by proving that the discrimination "actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (citations omitted); Williams, 2003 WL 1571559, at *9. Further, a plaintiff may "avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [the protected category] was a determinative factor in the adverse employment decision." Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996); Williams, 2003 WL 1571559, at *9. The plaintiff retains the burden at all times of proving that the employer's conduct was motivated by unlawful discrimination. Reeves, 530 U.S. at 141. If the prima facie case is established, a legal presumption arises that the employer unlawfully discriminated against the plaintiff. Id. This rebuttable presumption shifts the

burden to the employer to produce evidence that the plaintiff was rejected for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the sole remaining issue is whether the employer discriminated. Id. The plaintiff then has an opportunity to prove, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id.

Walker alleges race discrimination in the form of increased workplace scrutiny and discipline while in Phoenix. To establish his prima facie case, Walker must demonstrate that (1) he is a member of a protected group, (2) that he was performing his job at a level that met his employers's expectations, (3) that he suffered an adverse employment action, and (4) that facts exist that permit an inference of discrimination. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 258 (8th Cir. 1996).

Northwest contends that Walker has not established a prima facie case of race discrimination because there was no adverse employment action and no proof of disparate treatment. Northwest also asserts it had legitimate non-discriminatory reasons for the discipline and scrutiny of Walker, namely the RON grooming incident and Walker's temporary employment status. The Court believes that Walker has presented insufficient evidence to suggest that Northwest's decisions to scrutinize and discipline Walker were based on race.

Although Walker has satisfied prongs one and three of a prima facie case, he has not demonstrated that he was performing his job at a

satisfactory level. Rather, the record documents a serious failure by Walker to ensure that aircraft under his care was cleaned before its scheduled departure. As for the altercation between Walker and Vandermolen, under Northwest's Code of Conduct, Walker's behavior toward his manager warranted discipline. Regarding the fourth prong, Walker has presented virtually no evidence to supply an inference of improper motivation. A disparate treatment claim cannot succeed where the plaintiff does not produce "specific, tangible evidence" showing a disparity between similarly situated employees. Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 n.4 (8th Cir. 1998). To support his claim of increased scrutiny, Walker offers e-mails and memos from Phoenix management. However, the messages were sent to all ESEs and singled out Walker in no way. As for his discipline claim, Walker was the only Lead ESE responsible for the RON incident, and the only inferior employee involved in the Vandermolen altercation. However, there is some evidence suggesting that Miller, the other Lead ESE, was scrutinized less than Walker. (Walker Dep. Ex. 21 at 1.) Yet, in his deposition, Walker stated that Miller was not treated more favorably than he. (Id. at 108:3-8.)

Even assuming that Walker has established a prima facie case, Northwest has presented legitimate, non-discriminatory reasons for disciplining and scrutinizing Walker. Walker was a short-term, temporary employee who, as a result, was scrutinized more than his permanent, long-term counterpart. The burden of production therefore shifts to Walker, who, in response, has

offered no additional evidence on the record that the reasons offered by Northwest were pretextual. See Williams, 2003 WL 1571559, at *10. As a result, Walker's § 1981 claims of increased scrutiny and discipline should fail on summary judgment.

2. **Termination in San Francisco**

Walker asserts that his termination in December 1999 violates both Title VII and § 1981. Northwest does not dispute that Walker's termination claims are timely. Rather, Northwest argues that summary judgment is proper because Walker has proffered no evidence of disparate treatment and the company had legitimate non-discriminatory reasons for termination. Applying the same McDonnell Douglas analysis, this Court agrees that Walker's claims must fail.

As above, Walker has failed to establish prong two, that he performed his job satisfactorily, and prong four, that facts exist that permit an inference of discrimination. See Barge, 87 F.3d at 258. Regarding prong two, Walker has admitted that he violated established pass travel policies of which he was aware. (Walker Dep. at 47:1-8.) Thus, he failed to perform his job to Northwest's expectations as required. Importantly, in respect to prong four, Walker's charges of discriminatory conduct are aimed at persons in Phoenix who had nothing to do with Allard-Smith's decision to terminate him. The Eighth Circuit carefully distinguishes between evidence of discriminatory animus of nondecisionmakers or decisionmakers unrelated to the decisional

process from evidence revealing discrimination in the decisional process. Mohr. v. Dustrol, Inc., 306 F.3d 636, 640-41 (8th Cir. 2002.) Further, there is no evidence on the record that similarly situated ESEs were treated differently for travel pass violations outside Walker's own assertion of such in his Deposition. (Walker Dep. at 76:15-17.) However, to survive summary judgment, Walker must point to specific factual evidence supporting his claim. Rose-Matson, 133 F.3d at 1109. This he has not done.

Even assuming Walker has established a prima facie case, Northwest has presented legitimate, non-discriminatory reasons for terminating Walker. The burden of production therefore shifts to Walker, who, in response, has offered no additional evidence on the record that the reasons offered by Northwest were pretextual. As Walker has presented insufficient evidence to suggest that Northwest's decision to terminate him was based on race, this Court recommends that summary judgment be granted as to both his Title VII and § 1981 claims of wrongful termination.

### 3. **Hostile Work Environment in Phoenix**

Walker alleges that racial harassment by co-worker Chrzanowski constitutes a claim of hostile work environment under § 1981. A plaintiff may establish a hostile work environment claim based on race discrimination. Dowd v. United Steelworkers of Am., Local No. 286, 253 F.3d 1093, 1101 (8th Cir. 2001). Again, the Court employs the McDonnell Douglas burden-shifting analysis. To establish a prima facie case of race discrimination based on a

hostile work environment, Walker must show (1) he is a member of a protected group; (2) he received unwelcome harassment; (3) a causal nexus exists between the harassment and his status as a member of a protected group; and (4) the harassment affected a term, condition, or privilege of employment. See Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000). Walker must also show that Northwest knew or should have known about the harassment and failed to take prompt and remedial action. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).

Harassment is defined as conduct "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)). The conduct must be objectively and subjectively abusive. Id. at 21-22. Whether conduct is hostile is determined by considering all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

Northwest contends that there is no evidence of severe and pervasive harassment so as to rise to the level of a hostile work environment. Northwest further asserts that it took prompt remedial action in compliance with its requirements under the law. One basis of Walker's racial harassment claim is the increased scrutiny and discipline he received in Phoenix. As

discussed above, the e-mails sent by Vandermolen to all ESEs were not directed specifically at Walker. Therefore, there can be no causal nexus between Walker's race and Vandermolen's actions, as required to sustain the claim. See Bradley v. Widnall, 232 F.3d at 631. Moreover, the isolated incidents of discipline and increased scrutiny as described by Walker are not serious enough to amount to discriminatory changes in the terms and conditions of his employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quotations omitted).

Walker's allegations of racially and sexually harassing conduct by Chrzanowski give the Court more pause. Nevertheless, the Court finds that the isolated incidents described by Walker do not rise to the level of hostile work environment under the law. In his Deposition, Walker describes one specific comment by Chrzanowski directed to his race, and other general comments regarding her breast implants, sexual activity, and dislike of Walker. There was also one incident where Chrzanowski put her finger in Walker's face while yelling at him. However, considering all the circumstances, there is insufficient evidence that Chrzanowski's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See Harris, 510 U.S. at 21.

Further, Walker must demonstrate that Northwest failed to take prompt and effective remedial action. After Walker complained, Vandermolen promptly spoke to Chrzanowski about her behavior. Northwest also conducted

an internal investigation that resulted in the termination of Chrzanowski. However, that investigation was not completed for nine months. Nevertheless, considering all the circumstances, this Court believes that there is insufficient evidence from which a jury could find an objective hostile or abuse work environment. See id. at 23. Summary judgement is appropriate on Walker's claim of hostile work environment.

### C. Family Medical Leave Act Retaliation Claim

Walker asserts that his termination while on FMLA leave was retaliation for his taking FMLA leave. He also contends that Northwest prevented him from returning from FMLA leave. Northwest argues that Walker has failed to establish a prima facie case under the FMLA, and that it had a legitimate non-discriminatory reason for firing Walker, namely his unauthorized use of an expired travel pass while on FMLA leave.

FMLA prohibits employers from discriminating against employees for exercising their rights under the Act. 29 U.S.C. §§ 2612, 2615(a)(2). Retaliation for exercise of FMLA rights is therefore actionable. See Smith v. Mem'l Hosp. Corp., 302 F.3d 827, 832 (8th Cir. 2002) (citations omitted). An employee can prove retaliation circumstantially, using a variant of the McDonnell Douglas test. Id. The plaintiff must first establish a prima facie case of FMLA retaliation. Id. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. Id. at 833. The plaintiff must then introduce evidence sufficient to

prove that the employer's asserted non-discriminatory reason is a pretext and that the reason is unworthy of credence. Id. at 833-34.

In attempting to establish a prima facie case of retaliation, Walker has shown that he exercised rights afforded by FMLA, and that he suffered an adverse employment action. However, he has not shown a causal connection between his exercise of rights and his termination. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Id. at 832 (quotations omitted). Here, the only evidence proffered by Walker is that he was terminated while still on FMLA leave. However, he was not immune from firing for actions taken while on leave. See Sepe v. McDonnell Douglas Corp., 176 F.3d 1113, 1115 (8th Cir. 1999).

Even if Walker were able to establish a prima face retaliation case, Northwest has supplied a legitimate non-discriminatory reason for his firing. Walker rebuts Northwest's reason by asserting that he "was terminated for violating the Defendant's travel pass policy while white employees received little to no discipline." (Pl.'s Mem. Opp'n Mot. Summ. J. at 23.) Yet, there is no evidence whatsoever that any similarly situated employees were treated differently. As there is no evidence in the record showing that Northwest was motivated by Walker's assertion of his FMLA rights, summary judgment for Northwest is appropriate on the FMLA claim.

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion for Summary Judgment (Doc. No. 96) should be **GRANTED** in its entirety.

Dated: October 28, 2003

JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by NOV. 17, 2003, a writing which specifically identifies those portions of this Report to which objections are being made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.