# EXHIBIT 4

LEXSEE 2004 US DIST LEXIS 2825

**Brett J. Young, Plaintiff, v. Bodycote Lindberg Corporation, a Delaware Corporation, d/b/a Bodycote Thermal Processing, Defendant.**

**Civ. No. 02-4298 (RHK/AJB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

**2004 U.S. Dist. LEXIS 2825**

**February 25, 2004, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at Hervey v. Bodycote Lindberg Corp., 2004 U.S. Dist. LEXIS 2826 (D. Minn., Feb. 25, 2004)

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment GRANTED. Plaintiff 's Complaint DISMISSED WITH PREJUDICE.

**LexisNexis(R) Headnotes**

**COUNSEL:** Geraldine Carlen Steen, Beckman & Steen, Minnetonka, Minnesota, for Plaintiff.

Thomas E. Marshall and Mary L. Senkbeil, Jackson Lewis LLP, Minneapolis, Minnesota, for Defendant.

**JUDGES:** RICHARD H. KYLE, United States District Judge.

**OPINIONBY:** RICHARD H. KYLE

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

**Introduction**

Plaintiff Brett J. Young is an African American who has worked for Bodycote Lindberg Corporation n1, d/b/a Bodycote Thermal Processing ("Bodycote"), since 1994. While employed at Bodycote's Eden Prairie, Minnesota, metal treating facility, Young alleges that Bodycote paid him a racially discriminatory wage, denied him promotions because of his race, created a racially hostile work environment, and engaged in reprisal discrimination after Young filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Before the Court is Bodycote's Motion for Summary Judgment. For the reasons set forth below, the Court will grant Bodycote's motion.

n1 Bodycote purchased Lindberg Corporation on January 17, 2001 and changed its name to Bodycote Lindberg Corporation. (Marshall Aff. Ex. B (Manhatton Dep. Tr. at 23).)

[*2]

**Background** n2

n2 For the purposes of Bodycote's motion, the Court will view the facts in a light most favorable to Young. Fed. R. Civ. P. 56.

**I. Bodycote and its Operations**

Bodycote, a Delaware corporation with its principal place of business in Texas, provides metal treating services at various locations, including at its Eden Prairie facility. (Marshall Aff. Ex. A (Young Dep. Ex. 67 (Bodycote Employee Handbook)); id. Ex. B. (Manhatton Dep. Tr. at 9, 17).) Bodycote heat-treats metal in furnaces designed to harden the metal or provide it with a desired coating. The furnaces are set at certain temperatures and metal parts are then placed on conveyor belts and travel through the furnaces for a specified amount of time. When the parts come out of the furnace, some are "quenched" in tanks filled with oil or salt to cool. (See Def.'s Mem. in Supp. at 1-2; Young Dep. Tr. at 31-32, 46-49, 113-14.)

Bodycote runs its furnaces in three shifts. (Manhatton [*3] Aff. P2.) Each shift has a supervisor whose duties include disciplining employees, making pay raise recommendations, and performing evaluations. (Id. P4.) Groups of similar furnaces are organized into four departments and each department has a leader who schedules the orders to be run for all three shifts. (Id. PP2, 3; Manhatton Dep. Tr. at 21.) Individual furnaces are operated by Heat Treatment

Operators A, B, C, or D, and General Helpers. n3 (Manhatton Aff. P2.)

n3 Sometime after Bodycote acquired Lindberg in January 2001, all designations moved "down a notch" so that Department Leaders became Heat Treater A's, and Heat Treater A's became Heat Treater B's, and so on. (Manhatton Dep. Tr. at 20-22.) These changes were in title only and did not affect wages. (Id. at 22.)

A "General Helper," also referred to as "General Labor," cleans metal parts, prepares them for processing, packs them for shipping, and performs housekeeping tasks such as sweeping, trash disposal, and equipment cleaning. (See [*4] Young Dep. Tr. at 31.) A "Heat Treater D" prepares metal orders for shipment, tracks their movement, and completes required paperwork. A "Heat Treater C" enters the time and temperature settings for furnaces, enters and interprets data, runs inspections, maintains furnace logs, and operates all equipment within a department. A "Heat Treater B" performs all the duties of the C and D Heat Treaters and also determines when to shut the equipment down, starts and stops equipment in emergencies or on weekends, enters orders, and reports unsafe conditions or practices to management. n4 Finally, one "Heat Treater A" leads each of Bodycote's four departments. (Manhatton Dep. Tr. at 21.)

n4 Some information concerning these job descriptions was obtained from Exhibit A to the Affidavit of Robert Manhatton that was submitted in a related case, Campbell v. Bodycote Lindberg Corp., 2004 U.S. Dist. LEXIS 2824, Civ. No. 02-4300 (D. Minn. Feb. 25, 2004)(RHK/AJB).

Not only do these positions reflect different responsibilities and proficiencies, they command different wages. [*5] Each has a minimum, midpoint, and maximum hourly wage. (Manhatton Dep. Tr. at 20-21; Young Dep. Exs. 58, 59.) For example, effective February 4, 2000, the minimum, midpoint, and maximum wages for Group Leader was $13.18, $16.03, and $18.43 per hour and for Department Leader it was $15.39, $17.69, and $20.34 per hour. n5 (Young Dep. Ex. 58.) Effective March 5, 2001, the minimum, midpoint, and maximum wages for Heat Treater B's was $10.20, $13.27, and $16.33 per hour; for Group Leader it was $14.02, $16.50, and $18.98 per hour; and for Department Leader it was $15.85, $18.53, and $21.20 per hour. n6 (Id. Ex. 59.) In conjunction with these guidelines, wages are also affected by experience, competence, length of employment, and market conditions. (Manhatton Dep. Tr. at 19, 59-60.)

n5 This represented a 3% increase over the 1999 schedule. (Young Dep. Ex. 58.)

n6 This represented a 3% increase over the 2000 schedule. (Young Dep. Ex. 59.)

**II. Young's Tenure at Bodycote**

**A. Positions [*6] and Wages**

Young, a resident of Minneapolis, began working at Bodycote in October 1994 and continues to work there today. (Young Dep. Tr. at 285, Ex. 36.) Although he began with no prior heat treating experience (id. at 16), his tenure is marked by steady pay raises and promotions.

In October 1994, he began as a General Helper on the evening shift and was paid $7.40 per hour. (Id. at 16, 30-31, Ex. 36.) During 1995, he was promoted twice—first to Heat Treater C and then to Heat Treater B—and given corresponding pay raises so that by April 1996 he was paid $10.67 per hour. (Id. at 37-38, Ex. 36.) Then, in September 1996, he quit his job after having been passed over for a promotion to Heat Treater A. (Id. at 72-76; Pl.'s Mem. in Opp'n at 2.) As the only African American male in line for the position, he concluded that he was passed over because of his race. (Pl.'s Mem. in Opp'n at 2.) In October 1996, he returned to Bodycote with the encouragement of his supervisor, John Michaelson, at a wage of $10.67 per hour. (Id.; Young Dep. Tr. at 76, Ex. 36.)

In August 1997, Young was promoted to Heat Treater A and his pay was increased to $11.50 per hour. (Young [*7] Dep. Tr. at 96-97, Ex. 36.) In February 1998, he received a raise to $11.89 per hour, which he felt was "a slap in the [face]." (Pl.'s Mem. in Opp'n at 2; Young Dep. Tr. at 105.) In October 1998, he was promoted to Department Leader n7 and by the end of 1999 he was earning $13.31 per hour. (Young Dep. Tr. at 118, 134, Ex. 36.) In February 2000, his pay was increased to $13.69 per hour. (Id. Ex. 36.) In August 2000, he was promoted to Group Leader and was paid $14.94 per hour. (Id. at 134, Ex. 36.) Another raise followed in March 2001, bringing his pay to $15.54 per hour. (Id. at 135, Ex. 36.) In April or May 2001, Bodycote instituted a wage freeze, which meant that unless an employee was promoted, he was not given a raise. (Manhatton Aff. P7.) In spring 2003, however,

Bodycote authorized an overall wage increase (id. P9), and Young's pay was increased to $16.04 per hour (Young Dep. Ex. 36). His request to transfer to the day shift as a Heat Treater B was also granted. (Young Dep. Tr. at 135-36, 197, Exs. 36, 47.)

n7 Although Bodycote's records show that Young was promoted to Group Leader in October 1998 (Young Dep. Ex. 36), Young testified that he was actually promoted to a Department Leader at that time (id. at 134). It was not until August 2000, he states, that he was promoted to a Group Leader. (Id. at 134.)

[*8]

Notwithstanding the foregoing series of promotions and pay increases, Young contends that he was paid less than similarly situated non-minority co-workers for comparable work. n8 (Pl.'s Mem. in Opp'n at 20.) Specifically, he states that he was paid near the bottom of Bodycote's wage ranges. (Id. at 21.) He has identified Mike Grill, Steven Swing, Duane Nomeland, Mark Jensen, and John Pator as similarly situated non-minority co-workers who he claims were paid more. (Young Dep. Tr. at 207.)

n8 Young's Memorandum in Opposition to Summary Judgment contains no record citations. While he has filed an affidavit, he does not cite it in his memorandum. The Court reminds Young that the Court "is not required to speculate on which portion of the record [he] relies, nor is it obligated to wade through and search the entire record for some specific facts that might support [his] claim." White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (citations and internal quotations omitted); see Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

[*9]

**B. Young's Interest in Other Positions**

Although promoted several times, Young asserts there were five positions of interest to him to which he was not promoted: (1) a clamping department position; (2) a vacuum department position; (3) third shift supervisor; (4) second shift supervisor; and (5) a delivery driver position. (Pl.'s Mem. in Opp'n at 3, 4; Young Dep. Tr. at 148, 153-55; Manhatton Aff. P10; Young Aff. P6.)

**C. The Racial Atmosphere at Bodycote**

While at Bodycote, Young also asserts that he was subjected to a racially hostile work environment: (1) race-related comments were made either to him or others (Young Dep. Tr. at 186-89, 195-96, 257-58, 264-65); (2) he was the subject of verbal abuse (id. at 191, 210); (3) he experienced a near-physical confrontation with a Caucasian co-worker (id. at 220-24, 230, 232); (4) he suspected his supervisor of tampering with his work locker (id. at 287-88, 298); (5) he was disciplined for making defective parts and was not allowed to smoke outside (Young Aff. PP19, 28); and (6) he was falsely accused of computer tampering and of smoking marijuana (Young Dep. Tr. at 212-216).

**D. Young's Discrimination Charge [*10] and Bodycote's Alleged Reprisal**

On November 21, 2001, Young filed a racial discrimination charge against Bodycote with the EEOC. In the charge, he wrote:

I. I was hired for the Respondent on October 31, 1994 as Furnace Operator, I now work as a Group Leader. While in the employ of the Respondent I have been discriminated against on the basis of my race (Black) in that I have been denied promotions, paid less than White workers, and shift changes. I have repeatedly tried to change positions. My supervisors try to discourage me from these positions or give me reasons why I can not do the job.

I recently requested the position in the Vacuum Department. This position was open and I made a verbal request. I was told that I would not be a good fit there. I have trained in this department. I then made a formal written request for the position on October 18, 2001. The Respondent had a temporary worker doing this work. White workers are routinely granted shift changes that enable them to be with their families during normal hours. I have been denied these opportunities though I have been a hardworking and dedicated employee for seven years.

II. Respondent's reason for [*11] adverse action: business is slow.

III. I have been discriminated against on the basis of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended in that I have been

> denied promotions that were granted to less experienced White employees and I have been paid less than White workers with less experience.

(Id. Ex. 62 (EEOC Charge).) The EEOC issued a right to sue letter. (Pl.'s Mem. in Opp'n at 7.)

After the EEOC charge, Young alleges that Bodycote retaliated against him (see Pl.'s Mem. in Opp'n at 7, 28): (1) his overtime was reduced (Young Dep. Tr. at 297-98); (2) he was not promoted to second shift supervisor in August 2002 (Manhatton Aff. P10); (3) he was forced to train his replacement before he could move to a new position in early 2003 (Young Dep. Tr. at 198); (4) he was given two disciplinary points, instead of one, for violating a mandatory overtime policy in December 2003 (Young Aff. P29, Ex. A); and (5) his work was strictly scrutinized, he was not allowed to talk to friends, and he was subjected to a racially hostile work environment — i.e., he overheard racial epithets, he was involved in a near-physical confrontation, [*12] his locker was tampered with, he was not allowed to smoke outside, and he was accused of improper computer usage and marijuana smoking (Pl.'s Mem. in Opp'n at 28).

**Standard of Review**

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Sch., 122 F.3d 1112, 1116 (8th Cir. 1997). [*13] The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995); Elayaperumal v. Medtronic, Inc., 2002 U.S. Dist. LEXIS 26444, Civ. No. 02-860 (RHK/SRN), 2003 WL 21402602, at *6 (D. Minn. June 17, 2002).

**Analysis**

Young has filed a three-count Complaint against Bodycote. Count I alleges race discrimination and a racially hostile work environment in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.03, subd. 1(2)(c). n9 Count II alleges a pattern and practice of racial discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Count III alleges discriminatory reprisal in violation of the MHRA, Minn. Stat. § 363.03, subd. 7. Bodycote seeks summary judgment as to each claim. n10 The Court will begin with Count I.

n9 The MHRA has been re-numbered. For example, § 363.03, subd. 1(2)(c) is now § 363A.08, subd. 2(c). For convenience, however, the Court will refer to the prior numbering system because both parties have done so in their briefs.

[*14]

n10 Whether brought under the MHRA or Title VII, Young's claims are subject to the same legal analysis. See Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999) ("In construing the MHRA, we apply law developed in federal cases arising under Title VII." (citation omitted)); Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001) ("We apply the same analysis in reviewing [] discrimination claims brought under Title VII and the MHRA." (citation omitted)).

**I. Count I: Racial Discrimination in Violation of the MHRA**

**A. Discriminatory Wages**

Young alleges that he was paid less than similarly situated non-minority co-workers for comparable work. (Pl.'s Mem. in Opp'n at 20.) The MHRA prohibits an employer from discriminating "against a person with respect to . . . compensation" because of race. Minn. Stat. § 363.03, subd. 1(2)(c). To determine whether the MHRA has been violated, the Minnesota Supreme Court uses the three-part McDonnell Douglas test. Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999). [*15] Under that test, the plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. In the context of a

wage discrimination claim, the plaintiff must show that the employer "paid different wages to employees of different races for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Tademe v. Saint Cloud State Univ., 328 F.3d 982, 989 (8th Cir. 2003) (citations and internal quotations omitted). "Requisite skill is measured by such factors as education, training, experience, and ability." Id. (citation omitted).

Once the employee has established a prima facie case, the burden shifts to the employer to articulate a legitimate and non-discriminatory reason for the adverse employment action. Fletcher, 589 N.W.2d at 102. Upon articulation of a legitimate and non-discriminatory reason, the burden shifts back to the employee to show that the reason was not the true reason for the action, but was instead a pretext for discrimination. Id.

Bodycote argues that Young has not raised a genuine issue of material fact as to [*16] whether he was similarly situated to the non-minorities who were allegedly paid more. (Def.'s Mem. in Supp. at 25-27.) Although Young does not provide any evidence of what wages the non-minority co-workers were paid, or when they were paid more, he responds that he has made a prima facie case of wage discrimination because "he was near the bottom of [Bodycote's wage] range." (Pl.'s Mem. in Opp'n at 21.)

To make a prima facie case, Young must show that Bodycote paid him different wages than his non-minority co-workers for equal work on jobs requiring equal skill, effort, and responsibility. Tademe, 328 F.3d at 989. Young has failed to meet his burden in two ways. First, he offers no evidence of what wages his non-minority co-workers were earning. Rather, he testified only that Caucasian co-workers made "X amount of dollars for coming in that they shouldn't have been." (Young. Dep. Tr. at 206.) Young cannot rest on mere allegations that he was paid lower wages; rather, he must come forward with specific facts that create a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik, 47 F.3d at 957. Second, although he compares [*17] himself to several non-minority co-workers—Grill, Swing, Nomeland, Jensen, and Pator—he offers no evidence regarding the similarities between his job, skills (including education, training, experience, and ability), effort, and responsibility, and theirs. Instead, he "puts forward nothing more than conclusory allegations on this point, which are not sufficient to create a genuine issue of fact to survive summary judgment." n11 Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 683-84 (8th Cir. 2001) (citation omitted). Accordingly, the Court will grant Bodycote's motion with regard to Young's wage discrimination claims. n12

n11 In contrast, it is undisputed that Swing was the third shift supervisor with seventeen years heat treating experience and Grill was a utility worker (capable of operating all of Bodycote's machines) with fifteen years experience. (Manhatton Aff. PP5, 6.) Young had less experience and expertise than either Swing or Grill.

n12 Although Young argues that his wage was at the bottom of Bodycote's wage range, he does not say when this occurred. Because there is a one-year statute of limitations for MHRA claims, see Minn. Stat. § 363.06, subd. 3, the Court focuses on the one year prior to his November 2001 EEOC charge. Upon examination of Young's pay from November 2000 to November 2001, the Court finds that Bodycote followed its wage ranges. Therefore, had it been called upon to reach the issue, the Court would find that Bodycote's "compensation policy is a legitimate, nondiscriminatory reason for [Young's] wage rate." Poppe v. Home Depot Corp., 2001 U.S. Dist. LEXIS 18319, Civ. No. 99-1891 (ADM/AJB), 2001 WL 1640042, at *4 (D. Minn. Nov. 2, 2001). Young has not shown that this reason was a pretext for discrimination.

[*18]

**B. Discriminatory Failure-to-Promote**

Young next argues that he was repeatedly denied promotions, despite his qualifications, because of his race. (Pl.'s Mem. in Opp'n at 17.) The MHRA prohibits an employer from discriminating "against a person with respect to hiring . . . upgrading . . . or privileges of employment" because of race. Minn. Stat. § 363.03, subd. 1(2)(c). Again, the three-part McDonnell Douglas test applies. Lyoch v. Anheuser-Busch Cos., 139 F.3d 612, 614 (8th Cir. 1998). To establish a prima face case of a discriminatory failure-to-promote, a plaintiff must show that: (1) he was a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was rejected; and (4) a similarly qualified employee, not part of a protected group, was promoted instead. Id.; see Marzec v. Marsh, 990 F.2d 393, 395-96 (8th Cir. 1993). After a plaintiff makes a prima facie showing, the employer must produce evidence that it had a

legitimate, non-discriminatory reason for its actions. If the employer meets this burden of production, then the burden shifts to the plaintiff to [*19] show that the employer's actions were a pretext for discrimination. Lyoch, 139 F.3d at 614. At all times, the ultimate burden of proving discriminatory intent rests with the plaintiff. Marzec, 990 F.2d at 395.

Young has identified five positions to which he claims that Bodycote failed to promote him. First, he was discouraged from pursuing a position in the clamping department because Michaelson, his supervisor, told him that there was "no fun in that job" and "you wouldn't like it." (Young Dep. Tr. at 148.) When asked if he felt that Michaelson was trying to talk him out of the job because of his race, Young replied, "I never gave it a thought." (Id. at 149.)

Second, Young applied for a first shift position in the vacuum department (which is another type of furnace) and was told that he was going to get the job, but within an hour he was told that the job had been eliminated. (Id. at 153-55.) Robert Manhatton, Bodycote's General Manager, testified that the employee who held that position was terminated, but Young "assumed that we were going to fill the position. We chose not to." (Manhatton Dep. Tr. at 58.) Instead of filling the position [*20] by promoting someone, Bodycote covered the job with temporary and overtime workers. (Id.; Young Dep. Tr. at 159.) In July 2003, Bodycote decided to permanently fill the position, but at that time Young did not apply. (Young Dep. Tr. 200-01, Ex. 52.)

Third, in May 2000 Young was interested in a third shift supervisor position. (Pl.'s Mem. in Opp'n at 4; Manhatton Aff. P5.) He never applied for the position, however, and it was given to Mel Kreiman, who possessed little heat treating experience. (Manhatton Aff. P5.) When Steve Swing applied for a position at Bodycote in January 2001, Bodycote hired him to replace Kreiman because Swing had seventeen years experience and had worked as a supervisor. (Id.)

Fourth, in August 2002 Young applied for the second shift supervisor position. (Id. P10.) Two others also applied — Les Chanthakane, who is Laotian and had been at Bodycote since 1985, and Brian Lillquist, who is Caucasian. (Id.) Bodycote did not consider Lillquist, because he was not as well qualified as Chanthakane or Young. (Id.) While Bodycote considered Chanthakane and Young to be equally qualified, it gave the job to Chanthakane based on seniority. (Id.; [*21] Manhatton Dep. Tr. at 36-38). Young concedes that Chanthakane "was the logical selection." (Pl.'s Mem. in Opp'n at 5-6.)

Finally, he applied for a position as a delivery driver in early 1997 (Def.'s Mem. in Supp. at 19), but was not hired because he did not possess a commercial driver's license (Young Aff. P6). The person Bodycote did hire, however, did not have a commercial license. (Id.)

In response, Bodycote argues that Young has failed to make a prima facie case with regard to his first four claims because he has not offered evidence establishing all the essential elements of an actionable failure-to-promote. n13 (Def.'s Reply Mem. in Supp. at 4.) The Court agrees.

n13 Bodycote concedes that Young is a member of a protected group. (Def.'s Mem. in Supp. at 4.)

With regard to the clamping, vacuum, and third shift supervisor positions, Young fails to show that he applied, was qualified, or similarly qualified employees, not part of his protected group, were promoted instead. See Lyoch, 139 F.3d at 614. [*22] Although he was discouraged from applying for the clamping position, he acknowledges that he did not think that his supervisor's discouragement was discriminatory. (Young Dep. Tr. at 149.) While he thought the vacuum position was his, it is difficult to understand how he can maintain that he was the victim of discrimination due to Bodycote's refusal to hire him when the position did not exist. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) (stating that a prima facie case requires a showing "that he applied and was qualified for a job for which the employer was seeking applicants"). Moreover, Young has failed to produce any evidence showing he was qualified for the vacuum position or that the temporary and overtime workers who were assigned to that position were similarly qualified non-minorities. n14 Finally, it is undisputed that the person who was hired as the third shift supervisor, Steve Swing, had more experience and expertise. (Manhatton Aff. P5.)

n14 Had the Court been called on to reach the issue, it would have determined that Bodycote's reason for eliminating the vacuum position — economic slow-down — was legitimate and non-discriminatory. Although Young accuses Bodycote of toying with him by first saying he had the job, then saying it did not exist, Young has not shown that Bodycote's elimination of that position was a pretext for racial discrimination. See Arnold v. VA, 2000 U.S. App. LEXIS 5053, No. 99-1826, 2000 WL 307268, at *1 (8th Cir. Mar. 28, 2000) (unpublished) (finding "no jury issue for

trial because the [employer] showed legitimate economic reasons for every allegedly adverse employment action and [employee] failed to show those reasons were a pretext for discrimination" (citation omitted)).

[*23]

With regard to the second shift supervisor position, assuming Young has made a prima facie case, Bodycote has offered a legitimate, non-discriminatory reason for promoting Chanthakane — namely, his seniority. See Dodd v. Runyon, 114 F.3d 726, 730 (8th Cir. 1997). Young has offered no evidence suggesting Bodycote's reason was pretextual and he has not satisfied his burden to show discriminatory intent. Marzec, 990 F.2d at 395. In fact, he concedes that Chanthakane "was the logical selection." (Pl.'s Mem. in Opp'n at 5-6.)

Finally, Bodycote argues that Young's claim for failing to promote him to a delivery driver in 1997 is barred by the MHRA's one-year statute of limitations. It asserts that Young cannot recover for any promotion he was denied before November 2000 — one year prior to his November 2001 EEOC charge. (Def.'s Mem. in Supp. at 20.) Young responds that the statute of limitations is tolled by the continuing violation doctrine. (Pl.'s Mem. in Opp'n at 25-26.)

A complainant must bring an unfair discriminatory action claim "within one year after the occurrence of the practice." Minn. Stat. § 363.06, subd. 3. The [*24] continuing violation doctrine operates as an exception to the MHRA statute of limitations and allows a complainant to hold an employer liable for a series of related acts of harassment if the unlawful employment practice manifests itself over time. Costilla v. State, 571 N.W.2d 587, 593 (Minn. Ct. App. 1997). To preserve his claims under the continuing violation doctrine, however, Young "must show that at least one incident of [a failure to promote] occurred within the limitations period." Id. (citing Giuliani v. Stuart Corp., 512 N.W.2d 589, 595 (Minn. Ct. App. 1994)). As the foregoing has shown, however, Young has not offered sufficient evidence of a failure-to-promote in the one year prior to filing his EEOC charge (or in the one year prior to this action). Therefore, his driver position claim is not part of a continuing violation and is time-barred.

Accordingly, the Court will grant Bodycote's motion with regard to Young's failure-to-promote claims.

**C. Hostile Work Environment**

Young also claims that he was subjected to a racially hostile work environment. (Pl.'s Mem. in Opp'n at 22.) To establish a hostile work environment claim, [*25] Young must show that: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper action. Tademe, 328 F.3d at 991. Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 652 (8th Cir. 2003). The objectionable environment must be both objectively severe, as it would be viewed by a reasonable person, and subjectively severe, as it was actually viewed by the victim. Id.

In determining whether sufficient evidence of a hostile work environment has been presented, the Court considers all of the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Id. at 652-53. To satisfy [*26] the "high threshold of actionable harm," Young has to show his workplace was "permeated with discriminatory intimidation, ridicule, and insult." Id. at 653 (citation and internal quotations omitted). "Mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment" to implicate the anti-discrimination laws. Id. (citation and internal quotations omitted).

Young cites several examples of Bodycote's alleged racially hostile work environment. First, he asserts that the following race-related comments were made either to him or to others: (1) four years ago he overheard a co-worker, Joe Schlagel, say "Black people sure love their chicken" (Young Dep. Tr. at 186-87); (2) three-and-a-half years ago another co-worker, Bill Whelan, told him that he "looked like a monkey in a cage" (id. at 187, 189); (3) he heard Whelen also refer to African Americans as "niggers" and "coons" (id. at 195-96); (4) he overheard a former supervisor, Ed Lamberty, call someone a "colored donkey" (id. at 264) and say, while referring to an African American woman, "damn, that black woman got a fat [*27] ass" (id. at 264-65); and (5) he heard the former Plant Superintendent, Mark Wielgosz, refer to a Bosnian co-worker as "a fucking immigrant" (id. at 257-58).

Second, he claims that he was verbally abused. Upon telling Whelen about a safety hazard, Whelen said, "If [I] want[] any shit out of [you], [I]'ll kick

[you] in the ass" and "get the fuck out of my face." (Id. at 191). On another occasion, Mark Lindstrom, a Caucasian co-worker, called him a "pussy" and "a chicken." (Id. at 210.)

Third, he had a near-physical confrontation with Lindstrom. In January or February 2002, he and Lindstrom argued about who was in charge during the second shift in the absence of their supervisor. (Id. at 220-24.) Tempers flared and Young said, "fuck you," and Lindstrom responded by asking Young three times if he wanted "to step outside." (Id.) Young reported this incident to Wielgosz and Wielgosz told Young he was wrong for swearing and told Lindstrom that he was wrong for provoking a confrontation by asking Young to step outside. (Id. at 230, 232.)

Fourth, Young suspected Lamberty of tampering with his work locker and of attempting to plant something inside of [*28] it in order to get him terminated. (Id. at 287-88, 298.) He felt that Lamberty was motivated to do this because of Young's race, but when asked what he thought Lamberty would plant, Young testified, "I don't know. Anybody can do anything." (Id. at 288, 298.)

Fifth, he was disciplined for making defective parts and was not allowed to smoke outside. (Young Aff. PP19, 28.) In January 1997, he was "written up" for allowing parts to fall off a rack he was loading. (Young Aff. P19.) In contrast, Lindstrom was not disciplined for dropping a sledgehammer, and Gary Fuller, another Caucasian co-worker, was not disciplined for letting parts fall off a rack. (Id.) Similarly, he claims that he was not allowed to smoke outside, while Caucasian co-workers were allowed. (Id. P28.)

Finally, he describes two accusations brought against him that he believed were false. First, in November 2001, Lindstrom accused him of improperly accessing computer records that documented the wages of Bodycote employees. (Young Dep. Tr. at 212, 214.) And later, in January 2002, Robert Manhatton, Bodycote's General Manager, received an anonymous tip accusing Young of smoking marijuana. (Id. at 216.) [*29] Manhatton, however, never accused Young of using marijuana. (Id. at 216-17.) In fact, Young first heard of this allegation during his deposition in this case. (Id. at 216.)

Bodycote argues, *inter alia,* that Young has failed to establish the elements of a prima facie case because the alleged harassment was either not sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, or were not causally connected to Young's race. (Def.'s Mem. in Supp. at 15.) The Court agrees.

Young's examples of sporadic race-related comments are "neither severe nor pervasive enough to create a hostile work environment." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir. 2002); see Wallin v. Minnesota Dep't of Corrections, 153 F.3d 681, 688 (8th Cir. 1998) ("Because the discrimination laws are not a general civility code, offhand comments (unless extremely serious) and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment." (citation and internal quotations omitted)). While these comments were certainly offensive, offensive conduct is not enough to sustain [*30] a hostile work environment absent the requisite effect on the terms or conditions of employment. Woodland, 302 F.3d at 843.

Additionally, his allegations of verbal abuse and a near-physical confrontation do not indicate any causal connection to Young's race. Nothing about the comments "if [I] want any shit out of [you], [I]'ll kick [you] in the ass," "pussy," or "chicken" are race-based. Similarly, although the near-physical confrontation was unfortunate, Young's testimony reveals that it was motivated solely by disputed workplace authority, and that Lindstrom was reprimanded for his behavior. Race was not a factor. Likewise, none of his remaining allegations — the locker tampering, discipline n15, not being allowed to smoke outside, and the false accusations—is supported by admissible evidence that even suggests that race was involved.

n15 The 1997 disciplinary incident is time-barred for the same reasons his 1997 failure-to-promote claim is time-barred. See supra Analysis I.B.

[*31]

"Title VII does not . . . create a cause of action for all unpleasant or abusive behavior in the workplace" and Young has failed to show that this conduct was "discriminatory in nature and that [he] was singled out for such treatment on the basis of [his]" race. Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997) (citation omitted). Moreover, he has not shown, and the Court cannot find, that any of this alleged conduct unreasonably interfered with his work performance, Elmahdi, 339 F.3d at 653, given his continued (and current) employment with Bodycote, his steady promotions, and his pay raises. Accordingly, the Court will grant Bodycote's motion with regard to Young's hostile work environment claim.

**II. Count II: Racial Discrimination in Violation of Title VII**

In Count II, Young alleges a pattern and practice of race discrimination and a racially hostile work environment in violation of Title VII. Because Young fails to respond to Bodycote's motion with respect to his pattern and practice claim, the Court will dismiss it as waived. See Graham v. Rosemount, Inc., 40 F. Supp. 2d 1093, 1101 (D. Minn. 1999). The [*32] Court will also grant summary judgment for Bodycote on Young's federal hostile work environment claims for the reasons previously discussed.

**III. Count III: Reprisal Discrimination in Violation of the MHRA**

Young's final claim is that Bodycote engaged in reprisal discrimination. It is unlawful under the MHRA for employers to "intentionally engage in any reprisal against any person because that person . . . opposed a practice forbidden [by the MHRA] or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." Minn. Stat. § 363.03, subd. 7(1). "Reprisal" is defined as "any form of intimidation, retaliation or harassment" including assignment to a "lesser position in terms of wages, hours, job classification, job security, or other employment status." Id. § 363.03, subd. 7(2).

The three-part McDonnell Douglas test applies to reprisal claims. Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 859 (8th Cir. 1998) (applying Minnesota law); Fletcher, 589 NW.2d at 101-02. To establish a prima facie case of reprisal discrimination, Young must show (1) that [*33] he engaged in statutorily protected conduct; (2) there was an adverse employment action by Bodycote; and (3) a causal connection between his conduct and the adverse employment action. Bergstrom-Ek, 153 F.3d at 859; Fletcher, 589 N.W.2d at 101-02. It is undisputed that Young engaged in statutorily protected activity when he filed the EEOC discrimination charge in November 2001. (Def.'s Mem. in Supp. at 27.) The issue therefore is whether any of the instances of reprisal discrimination Young has identified satisfies the remaining elements of a prima facie case.

Young's first alleged instance of reprisal was reduced overtime hours. He argues, "Overtime was available; then it wasn't." (Pl.'s Mem. in Opp'n at 30.) At his deposition, he states that it "wasn't discriminatory, but it was done on purpose." (Young Dep. Tr. at 297.) He explains:

> A. . . . They're upset with me.
> Q. Why are they upset with you and not Lamont [a person who received overtime instead of Young]?
> A. Well, because with Les, Les is the supervisor of second shift, and that's what would be the time that I could get the overtime, on the second shift after 3 o'clock. And he's [*34] kind of ticked off at me because I didn't choose to stay on second shift to help him with his job.

(Id. at 297-98.) Although he claims that his overtime was reduced, his time sheet shows that he worked more hours in the four weeks after making the EEOC charge than in the four weeks before. (Id. Ex. 44.)

Bodycote asserts that there is no evidence that his alleged loss of overtime hours is causally connected to his EEOC charge. (Def.'s Mem. in Supp. at 27.) The Court agrees. "The kind of causal connection required for a prima facie case is not 'but for' causation, but rather, a showing that an employer's retaliatory motive played a part in the adverse employment action." Smith v. Mem'l Hosp. Corp., 302 F.3d 827, 833 n.6 (8th Cir. 2002) (citation and internal quotations omitted). Young, however, merely asserts "but for" causation and offers no evidence showing Bodycote's retaliatory motive played a part in his decreasing overtime. Moreover, any inference of a retaliatory motive that could be generated from his meager showing is significantly diluted by his admission that the reduced overtime was not discriminatory and by the evidence that he actually [*35] worked more hours in the four weeks after making the EEOC charge than in the four weeks before.

For his second, third, and fourth allegations, he claims that he was retaliated against in August 2002 when he was denied promotion to second shift supervisor, in early 2003 by being forced to train his replacement n16 (Young Dep. Tr. at 198), and again in late 2003 when he was given two disciplinary points, instead of one, for not covering mandatory overtime (Young Aff. P29, Ex. A). These allegations, however, fail to demonstrate a causal connection to his EEOC charge filed in November 2001. Young appears to rely simply on the temporal proximity between the EEOC charge and these incidents to support an inference of retaliation. "Generally, [however], more than a temporal connection . . . is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (citations omitted). The amount of time passing between the charge and these incidents cannot justify a finding of a causal link. See E.E.O.C. v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003) ("The further in proximity the decision to [*36] [retaliate] is from the protected activity, the less suspect the decision [to retaliate] becomes."); Kipp

v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) ("The interval of two months between the complaint and [the adverse employment action] so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [the plaintiff's] favor on the matter of causal link."). Beyond a temporal connection, Young has provided no competent evidence showing that a retaliatory motive played any part in these incidents. Smith, 302 F.3d at 833 n.6.

n16 Young claims that some Caucasian co-workers, such as Lindstrom, Brian Lillquist, and Sue Peterson, left their shifts without having to train in their replacement, while he was told that he was needed to train his replacement because the supervisor was on vacation and no one else was qualified to run the machines. (Id. at 199-200; Manhatton Dep. Tr. at 16.) Manhatton testified that it was not unusual for someone to have to stay in their position to train their replacement. (Manhatton Dep. Tr. at 16.)

[*37]

Finally, Young asserts that he was overly scrutinized at work, forbidden to talk with friends, and subjected to a hostile work environment in retaliation for his EEOC charge. (Pl.'s Mem. in Supp. at 28.) None of these allegations, however, is supported by any evidence of an adverse employment action taken by Bodycote. "An adverse employment action is exhibited by a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities." Tademe, 328 F.3d at 992 (citation and internal quotation omitted) (emphasis in original). "Employment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim." Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 715 (8th Cir. 2000) (citation omitted). Because Young suffered no material change in his salary, benefits, seniority, or responsibility as a result of any of these alleged events, he has not made an actionable claim for retaliation.

Accordingly, the Court will grant Bodycote's motion with regard to Young's reprisal claims.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings [*38] herein, **IT IS HEREBY ORDERED** that Defendant Bodycote Lindberg Corporation's Motion for Summary Judgment (Doc. No. 24) is **GRANTED.** Plaintiff Brett Young's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 25, 2004

RICHARD H. KYLE

United States District Judge