**GEORGE WALKER**
**1584 Babcock**
**Billings, Montana 59105**
**(406) 896-8031**

---

February 7, 2000

Equal Employment Opportunity Commission
Phoenix District Office
3300 North Central Avenue
Phoenix, Arizona 85012-1848

Dear EEOC:

Enclosed are completed questionnaires and supporting statements and documents for my complaint of discrimination against my former employer, Northwest Airlines. Although I am living in Billings, Montana at this time, the events of discrimination occurred while I was stationed in Arizona at the Phoenix International Airport (PHX).

If you have any questions or need more information, feel. free to give me a call.

Sincerely,

George Walker

George Walker

# STATEMENT OF DISCRIMINATION AND RETALIATION

## I. Introduction

For five years, I worked for Northwest Airlines (NWA) as an Equipment Service Employee (ESE), obtaining the position of Lead ESE or ESC (often referred to as a "Chief') on April, 28 1998. As an ESC, A was my responsibility to supervise a crew of ESEs in "grooming" aircraft between flights as well as fulfill other duties. Initially, I was a temporary ESC, working at different airports based on need. At the time of the following events, I was stationed at Phoenix International Airport (PHX) and worked the night shift (shift III) as a Chief. The mid-shift (shift II) worked prior to my shift and the day shift (shift I) followed my shift. PHX was the seventh station to which I had been assigned. Bill Miller, who is white and the permanent PHX Chief, was the other Chief on the night shift. Sometimes we worked on the same nights, but we were each the only Chief on night shift when the other had a day off. On the nights we worked together, Bill Miller and I had an agreement that he would take care of job assignments and most paperwork, while I would work on the planes, directly supervising the grooming crew.

At PHX, I was the only ESC who was not white. However, there were three other black individuals besides myself: May Sété, who is Samoan, and Timothy Caliver and Daryl Wellington, who both are also African American. These individuals also experienced discrimination and general racist attitudes while at PHX. Both May Sété and Daryl Wellington have subsequently left PHX and Timothy Caliver has quit working for NWA. I have been told each of these individuals experienced racial harassment at PHX which resulted in their leaving that station.

## II. Harassment from Patricia Chrzanowski

At one point Bill Miller took a vacation. As a result, I had to assume his tasks of job assignments and paperwork. On Wednesday, February 17,1999, Patricia Chrzanowski, a white ESE on my crew, became angry with me because she did not like the job I had assigned to her. However, based upon information she had provided me, she was not trained for the only other job I could have assigned to her. Chrzanowski became belligerent toward me, using an obscenity ("bulls-t") and pointing her finger in my face, close enough to touch my nose. I paged the manager, Rich Vandermolen, and we discussed Chrzanowski's behavior. Approximately one hour later, Chrzanowski returned to working, but her behavior caused a work slow-down such that our shift did not finish grooming all aircraft. Throughout the night, Chrzanowski bad-mouthed me, constantly cursing at me. Throughout the night, as on several other nights, Chrzanowski constantly discussed her "extreme" activities away from work, such as her so-called "swinger vacations" and her recent breast implants. I spoke again to Vandermolen the very next day about Chrzanowski's behavior, and he informed me to document any such behavior by any employee.

Chrzanowski consistently argued with me and used obscenities and racial slurs to address me. Many times, Chrzanowski would make racial slurs while working just low enough that I would not be able to hear them. If I heard something and asked her what she said, she would deny saying

anything. She called me a "nigger" and "monkey" many times. In addition, she often had conversations with others about "niggers" in general. One time in particular, I was on the telephone and Chrzanowski sat and called me "lips" in front of both May Sété and Mary Anne Schroeck. To my knowledge, Chrzanowski was never disciplined, although NWA has informed me that she is no longer with the company. (Attachment 30). 1 do not know if that is a result of my internal EEO Complaint or other events.

Chrzanowski made the workplace so unbearable for me that at times I became physically ill. She continuously threatened that she would "get me" and spread rumors about me to hurt my reputation. I spoke with Vandermolen on four different occasions about Chrzanowski. At one meeting with Vandermolen and John Innes (the night shift relief chief), Vandermolen told me that Chrzanowski is known for constantly speaking of her sexual exploits, but he still failed to take action to stop her. Vandermolen led me to believe that Chrzanowski would make sexual statements and then use them later against an individual. As a result, I became very fearful of entrapment given her overall negative attitude toward me. I intentionally refused to be alone with Chrzanowski, always leaving the room if no one else was present, and attempted to avoid her in all other situations whenever possible.

**III. Harassment from Rich Vandermolen**

During the same period that Chrzanowski made racial and sexual remarks to me, the manager, Rich Vandermolen, also scrutinized my work more than any other Chief. For example, as also noted by my co-workers, grooming inspections typically occurred only on nights when I was the lone chief (i.e., when Bill Miller was not at work). In addition, R.O.N. sheets (a checklist for grooming aircraft that "Remain OverNight") were strictly required of me, while not of other night shift Chiefs. Vandermolen also told me that in PHX, ESCs are "working chiefs," but John Innes (who is white) was permitted to nearly always remain in Operations completing paperwork and the like, and not required to groom aircraft.

I made my crew work extremely hard to ensure that all aircraft were properly groomed, not allowing them to miss any aspect of cleaning an aircraft. Nonetheless, I was continuously scrutinized for my work and the work of my crew. At the same time, individuals who had worked under both me and Bill Miller on separate occasions noted that he often told them to skip certain aspects of grooming to save time. But, to my knowledge, Bill Miller was never scrutinized for doing so.

Vandermolen also continuously questioned decisions of mine regarding overtime while not questioning such decisions by other Chiefs. Bill Miller had established the practice of keeping part-timers over for an extra hour to finish grooming aircraft, rather than calling others in early for overtime. I followed this practice, but Vandermolen forced me to explain myself on a nightly basis while Bill Miller's overtime decisions were considered final and unquestionable.

Lastly, I spoke with Vandermolen about the fact that my crew was short-staffed and explained that, as a result, sometimes the day shift may need to help finalize a few "loose ends" for the night shift when it falls behind. However, Vandermolen told me that was unacceptable; that I

could not leave any planes, or work for the day shift. But, Bill Miller left planes for the day shift on several occasions and was never disciplined or scrutinized for doing so.

## IV. <u>Continued Harassment and Retaliation from Rich Vandermolen</u>

On March 4, 1999, after another incident with Chrzanowski and still no assistance from I requested an EEO complaint form from Rich Vandermolen. We discussed several of the issues, including my feelings of disparate treatment, and the general manager, Bruce L. Barnhill, eventually took over the meeting. May Sété was also present at the meeting. I begged Barnhill to come in during the night shift to see if there was some room for improvement or if Vandermolen's scrutiny was otherwise justifiable. Although he promised to come into work during the night shift, he never did so, other than on March 24, 1999 to introduce himself to the night shift. Barnhill urged me to leave the discrimination matter "in-house" and he would handle it personally. He even asked that I call an individual at the Seattle Airport (SEA) to assure me that he was a "fair" manager. He also stressed that the utmost confidentiality was required and told me that if I filed an EEO Complaint and sent it to Minneapolis, the matter would just end up right back "in his lap." Nonetheless, I took the complaint form.

On March 6, 1999, Vandermolen called me at home at about 1:00 p.m. and asked that come in to the airport to discuss my work. At this meeting, I was represented by May Sété and Jim Hunt, Sr. (white), a stock clerk, as union representatives. Jim Hunt, Sr. had to leave the meeting to pick up his granddaughter and, immediately after he was gone, Vandermolen became verbally abusive toward May Sété and I. He was very loud and stated he was "running this meeting" and that "it's over when I say it's over." Vandermolen insisted on leaving his office door open, ensuring that everyone working the mid-shift could hear him belittling us. Vandermolen questioned my judgment and asked if I trusted May Sété. I explained that we were friends from working at Los Angeles International Airport (LAX) and he rolled his eyes, continuing his questioning.

Later, May Sété and I discovered that she had been passed up for an upgrade to full-time from status. May Sété was the only remaining part-time employee with full-time seniority. Regardless, Vandermolen recommended not considering May Sété, alleging that her attendance was poor. (Attachment 1). Instead, Vandermolen recommended two other individuals subordinate to May Sété, neither with perfect attendance, be given the upgrade. May Sété filed a grievance through the union and, after proceeding through the second grievance level, she was awarded the full time position.

On March 14,1999,Vandermolen sent Bill Miller and I a note regarding the failure of the night shift to finish grooming a plane the day before, based upon a message left by the day shift. (Attachment 2). Once again, this was due to the fact that we were short-staffed. Bill Miller explained the problems in a detailed memorandum to Vandermolen. (Attachment 3). Vandermolen suggested that we "could have called in a couple ESE for early in overtime.” (Attachment 2). However, we had attempted to call in some ESEs, but were unsuccessful in reaching anyone. (Attachments 3 & 4). Bill Miller and I made a copy of the sign-up sheet before the day shift arrived. The next day, we found

that the sign-up sheet had been altered to remove the evidence that we had attempted to call-in ESEs early. (Attachment 5). Vandermolen also complained of a problem regarding the amount of freight loaded on a particular flight, claiming that the amount and type of freight actually loaded was different than the amount documented. (Attachment 2). Again, this was based on the message left by day shift, not necessarily an independent investigation. (Attachment 2). However, there truly was no discrepancy - the documentation had simply been read incorrectly. Certain freight was not loaded, according to the established priority (Attachments 6), and the documentation reflected this. (Attachments 3 & 7). Vandermolen later apologized to Bill Miller, but never apologized to me.

On March 17,1999, Vandermolen questioned the loading of mail being transferred from the Detroit Airport (DTW) onto an aircraft. Vandermolen's complaint was that the mail was not individually marked and weighed. He sent a message to myself and Bill Miller regarding the incident, although Bill Miller did not work on the night in question. (Attachment 8). However, the mail was not marked and weighed because the Post Office did not provide it to us marked and weighed. Instead, we were only given the total weight of the transfer mail. (Attachment 9). Barnhill recognized that the problem was not with me and requested that Vandermolen "advise what action [he] ha[s] taken with DTW to resolve this issue once and for all." (Attachment 8).

On Sunday, April 4, 1999, I found several mistakes in the paperwork of Chief John Innes. Specifically, I noticed that he had entered in the total weight of aircraft cargo incorrectly - showing the monthly totals as that day's totals and not entering the daily totals at all. (Attachment 10). I pointed out this error to Vandermolen, who told me, "Good job," and asked if he could have a copy. I told him I would take care of it and corrected the errors. (Attachment 11). To my knowledge, John Innes was never scrutinized or talked to regarding this error.

On April 13, 1999, I arrived at work. The mid-shift chief in Operations, Ellis Boyd, called wheelchairs in for the night shift inbound flights and then left to clock out, as usual. Ellis Boyd always made it a point to relay any necessary information to me in Operations at that time. Steve Alford was the ramp chief during the mid-shift. As part of my nightly routine, I pulled up information on the last two flight arrivals. (Attachment 12). I noticed that Flight 115 was early. (Attachment 13). I also, as usual, checked the staffing of the mid-shift because if they are short-staffed, the night shift would have to finish their work. For example, we may have to dump the LAV truck, empty the trash cart, clear grooming supplies from the jetways or ramp, and finish grooming any aircraft left behind. Nonetheless, I noticed that the mid-shift was fully staffed. (Attachment 14).

Approximately ten minutes after Ellis Boyd left, Vandermolen came into Operations and I asked him if he knew whether the Flight 115 Airbus was groomed. Vandermolen stated that he did not know, so I told ESE José Romero that we should check the plane. At this time, José Romero informed me that Ellis Boyd told him the plane was groomed. (Attachment 15). Regardless, I attempted to check the plane at the end of the night, as with all other planes. Unfortunately, as José Romero has verified, no power and no stairs were hooked up to the Airbus and I could not check it. The Airbus was parked at gate 24. When I checked the plane at gate 25, I noticed that Tom West, Mechanic Supervisor, was sleeping in first class. I assumed that when he awoke, he would hook up

stairs and power to the Airbus. I completed my work, but never got back to the Airbus before the end of my shift.

The next day, I came to work at about 7:50 p.m. That day, the managers prepared food for the staff as a showing of "good job." I checked information on the last two arrivals, checked for messages, and checked the staffing for both the mid-shift and night shift. At about 8:15 p.m., while managers and ESEs were cleaning the area where the managers had been cooking, Tim Hamilton informed me that the Flight 115 Airbus for that day was groomed and that the managers wanted to speak with me. At about 8:30 p.m., Tim Hamilton and I went into the training room, where Vandermolen and Barnhill were waiting for us. First, Barnhill asked me if I would like to get something to eat, then congratulated me on my recent transfer to the Anchorage Airport (ANC) as a temporary Lead ESE. I assumed that, since it was appreciation day for the staff, the night shift would be receiving positive feedback for its hard work. Instead, Barnhill informed me that an aircraft was not groomed the day before, which caused two delays during the day shift. Because the problems were during the day shift, I was confused as to how the matter involved me. But, Barnhill explained that the aircraft from Flight 115 the previous day "was not touched."

I then explained to Barnhill and Vandermolen the occurrences of the previous day. I explained that the mid-shift chief, Ellis Boyd, as well as other mid-shift workers told José Romero that the aircraft had been groomed. I also explained that the mid-shift had the staff necessary to groom the plane and that mid-shift had plenty of time to groom the aircraft. (Attachments 13, 14, & 16). The aircraft arrived 1.5 hours before the end of the mid-shift and, based on company standards (Attachment 16), a crew of five could clean the aircraft in 1.3 hours. Mid-shift had more than 50 minutes from the time they completed unloading the aircraft until the end of their shift. Yet, instead of grooming the plane, I was told the mid-shift relaxed in Operations. Regardless, I explained that I attempted to check the aircraft, but could not because there were no stairs or ground power to the aircraft, which would be necessary to see if it had been groomed. Finally, I told Barnhill and Vandermolen that the ramp chief, Steve Alford, never informed me that the aircraft was not groomed, as he normally would.

I stressed the importance of José Romero's word that the plane had been groomed, since he had been informed by another Chief. Both Barnhill and Vandermolen simply told me never to trust the word of a co-worker unless I have worked with them for several years and that it was entirely my responsibility to find a Chief and check with him or her personally. They also told me that, regardless of any Chief's word, since the aircraft was an R.O.N. ("Remain OverNight"), it was still my sole responsibility to check any aircraft another Chief tells me is groomed. I explained that Tim Hamilton had just told me that Flight 115 for that day was complete and asked if I would have to check his work. Vandermolen stated that I would because mid-shift did not know how to complete a full grooming.

I told Bill and Vandermolen that perhaps there was some sort of miscommunication between the mid-shift chiefs and myself, but both managers still insisted that the entire matter was

my fault for assuming they were telling me the truth. Vandermolen even went so far as to say that Chief Ellis Boyd told me personally the aircraft was not done. This statement was a bold lie. Ellis Boyd did not communicate any such information to me that night.

At that point, Tim Hamilton told the managers we should all take a break. Before walking out the door, Barnhill said, "We're going to give you a Level 1."[1] I responded, "O.k." Just as I opened to door to walk out, Barnhill sarcastically said to me, "Oh, and if this incident happens again, we'll disqualify your chief time." I took this statement as a direct threat to the position I had worked so hard to achieve. I was extremely upset at Barnhill threatening me. Later, the union informed me that the managers have no authority to take away my chief time, which is earned through seniority and bidding processes governed by the collective bargaining agreement.

During the break, Tim Hamilton and I were unsure how to proceed, so we contacted Paul Unterbrink, the union president. I explained to Paul Unterbrink that I was extremely upset and did not feel I could complete my shift that night. I told him that I could not bear such blatantly unfair treatment and, although I intended to complete my temporary assignment at PHX (which was to end on April 24, 1999), I felt I was being pushed out.

Tim Hamilton and I then returned to the training room. Hamilton explained to the managers that I was extremely upset and requested that I be given the rest of the night off as sick leave. Barnhill agreed and then Tim Hamilton asked if they would give me an early release from PHX. Barnhill immediately responded, without hesitation, that it would not be a problem. Vandermolen then placed the form stating I was being given a Level I on the table, and I signed the form. We all left the room at that point and Vandermolen went directly to José Romero and told him that he would be upgraded to the new Chief.

Hamilton and I called Paul Unterbrink once again. Paul Unterbrink asked to speak with Barnhill, but Barnhill had already left. Thus, we hung up the phone and went into Operations so that I could clean out my locker. At this point, Vandermolen continued to antagonize me, saying "Are you leaving now, George?" He saw I was upset and kept pointing at me while making statements to upset me. I then approached him, we stood face to face, and exchanged words. I explained to him he was no longer my manager because I had been relieved and stated that I would be leaving.

At this point, I only spoke to Tim Hamilton, attempting to ignore Vandermolen. Vandermolen then picked up the telephone, as if to beleaguer me, and said, "Should I call security to escort you out?" Rather than respond, I simply walked over to my locker and began gathering my

[1] Pursuant to NWA's Performance Development guidelines, an employee with a performance problem is suppose to be "coached" for the first infraction, receive a Level I reminder for the second infraction, a Level II reminder for the third, and, if the conduct persists, a Decision-Making Leave ("DML"). A DML requires the employee taking time off with pay to consider their continued employment with NWA. If an employee receives a DML, he is subject to immediate termination for any future infractions within a specified period of time.

personal belongings. Vandermolen continued to harass me and screamed, "How long is it going to take you to get your stuff out?!" I answered, "Five minutes." Vandermolen then walked back into his office and picked up a copy of the NWA Rules of Conduct for Employees. He turned to Tim Hamilton and said, "You might want to tell George to chill out." He also stated, "You might want to read this to George," pointing to the rule regarding insubordination. He then turned to me, stating, "Do you need me to read it to you?" I replied, "If it makes you feel better." He then proceeded to read the rule out loud. I finished gathering my things, said "good-bye" to Mary Anne Schroeck and Steve Holt, and I left. From work, I went to the hospital because the extreme stress and anxiety I felt had resulted in chest pains. (Attachment 17). Vandermolen sent me a memorandum regarding the incident and the imposition of a Level I Reminder dated that same day. (Attachment 18).

Although the managers stated that I had the sole responsibility for ensuring the Flight 115 aircraft was groomed, Vandermolen had sent a memorandum to all Lead ESEs on March 10, 1999 which stated that all "PM shifts" are to "Use OT (if necessary) to ensure all ships [are] groomed completely." (Attachment 19). Mid-shift and night shift are considered the "PM shifts." Thus, according to Vandermolen's memorandum, the mid-shift chiefs were, at least, just as responsible as I for ensuing that me Flight 115 aircraft was groomed. Furthermore, mid-shift had extra time on April 13, 1999 that they could have utilized to at least start the aircraft. Based on company standards, the mid-shift had around 4.5 man-hours of grooming for which it cannot account (five groomers x 56 minutes they sat in Operations). In addition, on that day, April 14, 1999, the mid-shift had completed the same aircraft from the same flight, despite Vandermolen's statement that they did not have the knowledge to do so. That night, the work unloading the aircraft and the available crew were both relatively the same as on April 13, 1999, and the mid-shift crew still had time before the end of its shift to eat at the barbecue before the end of their shift. (Compare Attachment 13 & 14 to 20 & 21).

Notably, prior to me filing my first EEO Complaint with NWA, there were actually nights when the night shift did not finish grooming aircraft without any resulting scrutiny or discipline. For example, the night Chrzanowski caused a work slow-down, her conduct resulted in some grooming being left for the morning shift. Yet, no disciplinary action was ever taken. In addition, the night shift almost always had to clean up after the mid-shift, especially if they were short staffed, despite Vandermolen's written directive that "a member of the Lead ESE team (if more than one on duty at the same time) must check to see if ... A. Trash cart is emptied for next shift. B. Jetbridges are clear of all trash, grooming supplies, etc. .. E. Equipment is not left spread all over the ramp. F. LAV truck is dumped if full." (Attachment 19). To my knowledge, the mid-shift chiefs were never scrutinized or disciplined for leaving such work for the night shift to complete.

Beyond grooming aircraft, Vandermolen had also sent a memorandum regarding sleeping on aircraft. In a February 16, 1999 memorandum, Vandermolen stated, "Probably the most disturbing discovery is that of a ‘bed’ being improvised with blankets and pillows across a row of seats on the RON DC 10, and the aircraft not completely groomed (Note: Any member of the staff found sleeping on an aircraft or ‘on duty’ will be immediately removed from duty and appropriate action taken.

There will be no further tolerance of this type of behavior)." (Attachment 22). Although I found Tom West sleeping on the DC 10 on April 13, 1999 (the person responsible for hooking up stairs and lights to the aircraft I could not inspect), no disciplinary action that I am aware of was taken against him. In the end, although others were guilty of infractions resulting in the delays for day shift and Vandermolen had previously stated finishing an aircraft was the responsibility of both the mid-shift and night shift, I was the only individual disciplined for the plane not being groomed on April 13, 1999.

Until being stationed at PHX, I had never received any disciplinary action against me in the five years I worked for NWA. On the contrary, I have had nothing but compliments and commendations from previous managers at other stations and even my co-workers at PHX. I have included several written recommendations and statements of my performance over the years. (Attachments 23).

## V. Results of NWA Internal EEO Investigation

On April 21, 1999, 1 filed a second EEO Complaint with NWA regarding the continued harassment and retaliation from Vandermolen. NWA assigned Brian Cote as the investigator of my complaints. I have been told that Brian Cote's employment was terminated at some point, but I do not know the reason. Although I left PHX, Vandermolen did not entirely stop his actions. At the time, five individuals were transferring from PHX to ANC - myself, May Sété, and three white individuals. I was scheduled to arrive in ANC to begin work on May 17, 1999. Prior to our arrival at ANC, Vandermolen telephoned the manager at Anchorage and told the manager that May Sété and I were lazy, problematic, troublemakers, and worthless. Apparently, Vandermolen did not make any comments one way or another about the three white individuals.

After I finished my term at ANC, I was awarded a permanent station at San Francisco International Airport (SFO). Because my wife became seriously ill, however, I went on family and medical leave. I never heard anything from NWA regarding my internal EEO Complaints.

In December 1999, I wanted to return from family and medical leave, so bid on a position in Las Vegas (LAS). I was awarded the bid on December 9, 1999. However, before I could get to LAS, the manager there called and asked if I was still subject to the disciplinary action taken against me at PHX. I told him I was and he said he would call me back. I never heard from him again and could not find out from anyone why I was not being scheduled for work. Based on advice from union representatives, however, I attempted to exercise my right to return to work at my permanent station at the time of leave, SFO, pursuant to the terms of the collective bargaining agreement and the Family and Medical Leave Act. I called the manager at SFO on December 16, 1999 and told her I was ready to return from leave. The manager at SFO told me that she had to talk to NWA's Labor Relations Department about my returning and would get back to me. I was never permitted to return to work.

On December 21, 1999, I received a letter (dated December 11, 1999) from NWA's EEO Director stating that my complaints had been investigated, but they did not find any harassment or retaliation against me. (Attachment 24). Specifically, NWA stated that, although it found Chrzanowski made sexual and racial comments, it felt that none were directed toward me particularly. With regard to Vandermolen, NWA found that he scrutinized my work more than Bill Miller's, but determined it was justified because Bill Miller has been employed by NWA for a substantial period longer then me and that he was permanent at PHX while I was temporary.

Although Bill Miller had worked for NWA for many years, he had only been a Chief for six months longer than me. As for the retaliation, NWA found that the disciplinary action was not related to my race. I am in the process of requesting a reconsideration by the Vice President of Labor Relations, Robert A. Brodin, in accordance with NWA's Discrimination and Harassment Policy.

On December 23, 1999 I received a second letter from NWA terminating my employment. (Attachment 25). The grounds for termination were stated to be based upon my use of an expired trip pass to travel for personal reasons and my refusal to come to a "Question & Answer" session on December 18, l999 regarding a matter between May Sété and I. Although it is true that I utilized a trip pass to travel, such a policy violation does not usually result in termination unless an individual has a history of disciplinary action. In other words, I likely would not have been legitimately terminated for the use of the pass if I had not been previously disciplined by Vandermolen. As for the refusal to attend the Question & Answer session, my union representatives advised me not to go because I was on family and medical leave. They had told me to tell NWA I would be happy to appear as moon as they allowed me to return to work and no longer on leave. Nonetheless, NWA considers the failure to appear insubordination and refusal tocooperate with the company. Violation of the latter policy is said to be a terminable offense. I have filed a grievance for this termination through my union, in part on the grounds that I was exercising my right to family and medical leave with which NWA has interfered. I believe my discharge may be based upon discrimination, given the fact that I likely would not have been terminated had I not been previously disciplined by Vandermolen in PHX. In other words, to the extent that my termination is a final result of the occurrences at PHX, my termination was merely the last event of the discriminatory treatment I received.

George Walker
George Walker Date 2-5-00